Stephen M. Lobbin (SBN 181195)
sml@smlavvocati.com
Austin J. Richardson (SBN 319807)
ajr@smlavvocati.com
**SML Avvocati P.C.**
888 Prospect Street, Suite 200
San Diego, California 92037
Tel: 949.636.1391

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| **ENGINEER.AI CORPORATION d/b/a BUILDER.AI**, a Delaware corporation,<br><br>             Plaintiffs,<br><br>      v.<br><br>**BARRY B. KAUFMAN**, an individual, and **LAW OFFICES OF BARRY B. KAUFMAN**, a professional corporation,<br><br>             Defendants. | Case No. 2:22-cv-03552<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

For its Complaint, Plaintiff Engineer.ai Corporation d/b/a Builder.ai ("EAI" or "Builder") hereby alleges as follows:

## JURISDICTION AND VENUE

1.      This is an action including for defamation, business disparagement, and interference with contractual relations and prospective advantage.  This Court has subject matter jurisdiction under 28 U.S.C. §§ 1332 and 1367.

Case No. _____

2.      This Court has personal jurisdiction over Defendants because they reside and conduct business in California, and have committed the unlawful acts alleged herein including in this jurisdiction.

3.      Venue is proper in this Judicial District under 28 U.S.C. § 1400.

## PARTIES

4.      Plaintiff is a Delaware corporation having its principal U.S. place of business in Utah.

5.      Upon information and belief, Defendant Barry B. Kaufman is an individual residing in California.

6.      Upon information and belief, Defendant Law Offices of Barry B. Kaufman is a California corporation having its principal place of business in Encino, California.

## FACTUAL BACKGROUND

7.      Since 2019, Defendants have engaged in an intentional campaign to damage and devalue Builder's business. This campaign has included (a) instigating an August 14, 2019 article in the *Wall Street Journal* entitled "AI Startup Boom Raises Questions of Exaggerated Tech Savvy" ("the WSJ Article," <u>Exhibit 1</u> herewith), (b) pursuing a meritless lawsuit filed in 2019 on behalf of Robert Holdheim ("the Holdheim Lawsuit"), (c) pursuing another meritless lawsuit filed in 2020 on behalf of Joshua Joiner ("the Joiner Lawsuit"), (d) sending a defamatory letter dated October 5, 2021 to EAI's investor Lakestar Advisors GmbH ("the Lakestar Letter," <u>Exhibit 2</u> herewith); (e) serving an improper subpoena on Carta ("the Carta Subpoena," <u>Exhibit 3</u> herewith) to obtain sensitive investor and employee information; (f) sending a defamatory letter dated April 13, 2022 to EAI concerning Mr. Angel Padilla ("the Padilla Letter," <u>Exhibit 4</u> herewith); (g) unethically instructing Joshua Joiner and his wife to record or take notes on protected attorney-client privileged discussions after Defendants met with Joiner and established an improper attorney-client relationship; (h) misusing and misstating

Case No. _____

Utah law to threaten Builder and its employee with litigation; (i) threatening counsel with administrative proceedings to gain an unfair advantage during a civil dispute; (j) sending yet another extortionist demand letter, threating to contact Builder's most recent investor Insight Partners ("the Insight Letter," Exhibit 5 herewith); and (k) issuing an irrelevant subpoena to Insight Partners ("the Insight Subpoena," Exhibit 6 herewith).

8.  The WSJ Article purports to be an exposé of Builder's use of artificial intelligence in the building of apps for its clients.  The thrust of the WSJ Article is that while purporting to employ cutting edge artificial intelligence (hereafter "AI") to help users build apps more cheaply and efficiently, Builder actually uses human engineers in India and elsewhere, and its clients lie to investors about Builder's capabilities (the "Allegation").

9.  The Allegation was false at the time the WSJ Article was published, and it remains false.  The Allegation strikes at the core of Builder's business and has, since publication, caused significant harm.

10.  For example, Builder never asserted that it solely used AI to assemble direct codes for its apps, or that it was not using engineers to assist with the development of those codes.  As is made clear in a recent Techcrunch article (*see* https://techcrunch.com/2022/03/30/builder-ai-raises-100m-series-c-led-by-insight-partners-to-scaleup-its-software-automation/), although Builder may not have been using AI to assemble the direct codes, and instead using remote-working engineers to build the apps, it was clearly using machine learning to speed up and automate large swathes of both customer interaction and engineer assignments.

11.  Further, the allegations made in Mr. Holdheim's lawsuit were false, and the quote he attributed to Mr. Duggal was never uttered.  Mr. Duggal never told anyone during the relevant time that the platform was 80% built.

12.  While the WSJ Article does not name the sources relied upon in the Article, it is clear from the wording used, the context and the timing of the WSJ

Case No. _____

Article it appears that they are mostly made up of ex-employees of Builder who were aligned with Mr. Holdheim and represented by the same lawyer that represented him—that is, Defendants Barry Kaufman and his law firm.

13.     Builder's position is that these sources have clear "axes to grind" against and have proven themselves to be unreliable on a number of occasions.  For example, in respect of Mr. Holdheim himself, he alleged in his lawsuit against our clients that Mr. Duggal had spent company money to fund various luxurious personal lifestyles.  In fact, during the course of the litigation Mr. Holdheim admitted under oath that he: (a) had no personal knowledge of whether Mr. Duggal used company or investor funds to finance the alleged expenses; (b) was not aware that Mr. Duggal actually uses his own personal funds to finance Builder; (c) had no direct knowledge as to whether these alleged expenses were paid for by Mr. Duggal out of his personal funds; (d) never saw any evidence or Mr. Duggal blurring financial lines; and (e) had never had access to the financial records of Builder.

14.     In such circumstances, where Mr. Holdheim admitted that one of his chief allegations was based on no evidence, his credibility and reliability must be drawn into question.  Following this, as Mr. Holdheim is the key source of the Allegation, it is clear that the Wall Street Journal should not have published the Allegation.

15.     Builder believes that as part of the litigation strategy employed by Defendants, the media has been used to conduct a smear campaign against Builder.  As part of this smear campaign, it appears Defendants are motivated solely by pressure to extract a favorable settlement.  It appears that such sources have axes to grind, are not objective, and cannot be sensibly or properly relied upon to support the serious Allegation leveled against Builder in the WSJ Article.

16.     In addition, the WSJ Article has been cited in a number of different litigation claims brought by Defendants.  In doing so, Defendants (the main source of the WSJ Article) has been able to use the false claims in the WSJ Article to

procure an unfair litigation advantage, by taking advantage of the Wall Street Journal's reputation for accuracy to provide credibility for the otherwise unfounded Allegation within the context of the proceedings.

17.     The Holdheim Lawsuit is meritless.  In fact, the pre-suit separation package offered to Mr. Holdeim is worth 4-8 times more than the settlement extracted by Mr. Kaufman through threats of public embarrassment and the WSJ Article.

18.     While Mr. Holdheim ultimately received much less than his pre-suit offer from EAI, Defendants extracted hundreds of thousands in legal fees as part of the Holdheim settlement.

19.     The Joiner Lawsuit is meritless because Mr. Joiner was part of a reduction due to COVID, along with more than 20 others former employees in approximately the same office location.

20.     The Lakestar Letter is defamatory because it contains false and defamatory statements, including: (a) "Builder [engaged in] efforts to mislead, if not defraud, its Board of Directors, investors, customers and the general public about technological and business capabilities that Builder supposedly possessed;" (b) "Mr. Holdheim was at first marginalized and later terminated on false grounds . . . [for] complaining about fraudulent and misleading ways Mr. Duggal was promoting Builder to investors, customers and the general public;" (c) "Mr. Duggal [] abandon[ed] his new home in Beverly Hills, relocate[d] the company to London and create[d] new subsidiaries as a means to hide assets and contain liability;" (d) "[T]he consideration paid [to Mr. Holdheim] in settlement was concealed from Lakestar and other investors by being categorized as part of the 'severance payroll' to staff of the Los Angeles office which Builder has since closed as a liability containment tactic;" (e) "Mr. Duggal . . . used more than $5 million of Lakestar's funded capital to purchase a luxury home in Beverly Hills;" (f) Builder.ai was "falsely promoting that it possessed artificial intelligence ('AI') and machine learning capabilities to

supposedly assemble software products 'autonomously;'" (g) "Builder has never had the technological capabilities to 'instantly' and autonomously assemble software;" and (h) "Builder still does not possess an operational or functional AI capability."

21.     The Carta Subpoena is improper because it allowed an invasion of Builder's confidential information including its investor information and employees with stock options.

22.     The Insight Subpoena is improper because (a) the scope of the subpoena is far beyond the issues in the Joiner Lawsuit, (b) Insight only recently became an investor in EAI and is outside the period of controversy between the parties, and (c) it was issued to further defame, embarrass, and tortiously interfere with EAI's business relationship with its latest investor.

23.     The Padilla Letter is defamatory because it disparages EAI's management and alleges fraud along similar lines as the Lakestar Letter. Additionally, upon information and belief, Defendants allowed Mr. Padilla to "stalk" online certain family members of one or more of EAI's employees. Defendants further misquoted and misused Utah law to attempt to obtain confidential information of EAI and to threaten EAI and its employees with administrative and/or civil actions.  Upon information and belief, Defendants do not have a license to practice law in the State of Utah.

24.     The Joiner Meeting was unethical and improper because while an attorney may communicate with non-party adverse witnesses without notification or consent of the other party's lawyer, the Joiner Meeting concerns attorney-client privileged information as asserted by both Joiner and Kaufman during Joiner's first deposition.  The Joiner Meeting with counsel was in the State of California, which required dual consent.  Upon information and belief, Joiner and/or his wife illegally recorded the attorney-client call and then proceeded to transcribe the call in notes.

25.     During Joiner's second deposition, Defendants further threatened EAI's counsel with an administrative action in an attempt to gain an advantage in a civil dispute.

26.     Defendants' improper actions have caused severe and irreparable damage, including at least $1.2 Billion due to a $600 million Series C pre-money valuation, compared to an otherwise $1.8 billion valuation that Builder could have attained but for the interferences and harmful actions of Defendants.  The irreparable damage to Builder will be exacerbated unless and until Defendants are enjoined from initiating any further contact with Builder's investors or potential investors, employees, and any further defamation or other disparaging statements or conduct.

27.     EAI's patent portfolio reflects its innovation and long-time investment in R&D across multiple technology areas, including automation, AI, apps development, development, development environment, product management, quality assurance and testing, security, productivity, cloud computing, and low-code/no-code application development platform.  EAI's products and services are protected by one or more U.S. and international patents and applications, including for example, those herewith as Exhibit 8.

## FIRST CLAIM FOR RELIEF

### (Defamation for False Statements)

28.     Plaintiff incorporates by this reference all of the allegations stated in the above paragraphs.

29.     As alleged hereinabove, Defendants have published false statements and implications about Builder, including its business practices and capabilities, and its use of investor funds.  The false implications were intentionally made through the false statements, by other statements that were misleading due to material omissions, by presenting misleading juxtapositions of statements, and when taking

Case No. _____

into account the context of each publication.  The false implications were also made through the disinformation campaign as a whole.

30.     These false statements and implications were and would be reasonably understood to be statements of fact about Builder.

31.     These statements and implications were published without privilege or legal authorization, and if there was any such privilege or authorization (and there was not) it was intentionally abused.

32.     These statements and implications were broadcast, published and republished to third parties.  The broadcasts, publications and republications with these false statements and implications were widely disseminated by Defendants.

33.     These statements and implications were defamatory because they exposed Builder to contempt, ridicule, and disgrace, and because they induced an unsavory opinion of Builder and its business into the minds of a substantial number of the community.

34.     These statements and implications were defamatory per se since they charged Builder with serious fraud and were of a nature tending to injure Builder in its trade, business, and profession.

35.     Each Defendant acted with fault, at least negligence, and with actual malice.  Each Defendant knew these defamatory statements and implications were false, or recklessly disregarded the truth or falsity of the statements and implications, when they broadcast, published, and republished them.

36.     Each Defendant also acted to deliberately and malicious injure Builder out of hatred, ill-will or spite, and/or for improper motives.

37.     These false statements and implications by Defendants were a substantial factor in causing Builder to suffer irreparable harm to its reputation and suffer economic loss, and Builder is thus entitled to compensatory damages.

Case No. _____

38.     As a direct and proximate result of these false statements and implications by Defendants, Builder has also suffered and will continue to suffer actual, consequential and special damages in an amount that will be determined at trial.

39.     Plaintiff is also entitled to punitive damages because Defendants acted with actual malice and ill-will and spite towards Plaintiff and for improper motives.

## SECOND CLAIM FOR RELIEF

### (Business Disparagement)

40.     Plaintiff incorporates by this reference all of the allegations stated in the above paragraphs

41.     As alleged herein, Defendants have published false and disparaging statements about Plaintiff.

42.     Defendants' alleged false and disparaging statements alleged herein were unprivileged.

43.     Each Defendant acted with fault, at least negligence, and with actual malice.  Each Defendant knew these disparaging statements were false, or recklessly disregarded the truth or falsity of the statements and implications, when they broadcast, published, and republished them.

44.     Each Defendant also acted to deliberately and malicious injure Builder out of hatred, ill-will or spite, and/or for improper motives.

45.     These false and disparaging statements and implications by Defendants were a substantial factor in causing Builder to suffer irreparable harm to its reputation and suffer economic loss, and Builder is thus entitled to compensatory damages.

46.     As a direct and proximate result of these false and disparaging statements and implications by Defendants, Builder has also suffered and will continue to suffer actual, consequential and special damages in an amount that will be determined at trial.

Case No. _____

47.   Plaintiff is also entitled to punitive damages because Defendants acted with actual malice and ill-will and spite towards Plaintiff and for improper motives.

### THIRD CLAIM FOR RELIEF

### (Intentional Interference With Contractual Relations)

48.   Plaintiff incorporates by this reference all of the allegations stated in the above paragraphs.

49.   As alleged herein, Plaintiff has a valid contract with its investors, including Lakestar.

50.   Defendants had knowledge of the contracts.

51.   Defendants acted intentionally to induce a breach or to disrupt Plaintiff's contractual relationships.

52.   These contractual relationships were breached or disrupted.

53.   Each Defendant acted with fault, at least negligence, and with actual malice.  Each Defendant knew these disparaging statements were false, or recklessly disregarded the truth or falsity of the statements and implications, when they broadcast, published, and republished them.

54.   Each Defendant also acted to deliberately and malicious injure Builder out of hatred, ill-will or spite, and/or for improper motives.

55.   These false and disparaging statements and implications by Defendants were a substantial factor in causing Builder to suffer irreparable harm to its reputation and suffer economic loss, and Builder is thus entitled to compensatory damages.

56.   As a direct and proximate result of these false and disparaging statements and implications by Defendants, Builder has also suffered and will continue to suffer actual, consequential and special damages in an amount that will be determined at trial.

Case No. _____

57.     Plaintiff is also entitled to punitive damages because Defendants acted with actual malice and ill-will and spite towards Plaintiff and for improper motives.

## FOURTH CLAIM FOR RELIEF

### (Intentional Interference With Prospective Advantage)

58.     Plaintiff incorporates by this reference all of the allegations stated in the above paragraphs.

59.     An economic relationship between Plaintiff and its investors and potential investors, with the probability of future economic benefit to Plaintiff.

60.     Defendants had knowledge of these relationships.

61.     Defendants acted intentionally to disrupt these relationships.

62.     Each Defendant acted with fault, at least negligence, and with actual malice.  Each Defendant knew these disparaging statements were false, or recklessly disregarded the truth or falsity of the statements and implications, when they broadcast, published, and republished them.

63.     Each Defendant also acted to deliberately and malicious injure Builder.ai out of hatred, ill-will or spite, and/or for improper motives.

64.     These false and disparaging statements and implications by Defendants were a substantial factor in causing Builder to suffer irreparable harm to its reputation and suffer economic loss, and Builder is thus entitled to compensatory damages.

65.     As a direct and proximate result of these false and disparaging statements and implications by Defendants, Builder has also suffered and will continue to suffer actual, consequential and special damages in an amount that will be determined at trial.

66.     Plaintiff is also entitled to punitive damages because Defendants acted with actual malice and ill-will and spite towards Plaintiff and for improper motives.

Case No. _____

# **PRAYER FOR RELIEF**

Therefore, Plaintiff prays for the following relief:

A.      An injunction requiring Defendants to disavow, de-publish and remove the WSJ Article;

B.      Compensatory damages in an amount to be determined at trial;

C.      Actual, consequential and special damages in an amount to be determined at trial, but no less than $1.2 billion;

D.      Punitive damages;

E.      Reasonable and necessary attorneys' fees;

F.      Reasonable and necessary costs of the suit;

G.      Prejudgment and post-judgment interest at the highest lawful rates;

H.      Declarative and injunctive relief; and

I.      Such other and further relief as this Court deems just and appropriate.

# **DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38(b) and L.R. (C.D. Cal.) 38-1, Plaintiff hereby demand a jury trial on all the issues so triable in this action.


                                    Respectfully submitted,

Dated:  May 25, 2022               **SML Avvocati P.C.**

                                    By:   /s/ Stephen M. Lobbin
                                          Attorneys for Plaintiff