Stephen M. Lobbin (SBN 181195)
sml@smlavvocati.com
Austin J. Richardson (SBN 319807)
ajr@smlavvocati.com
**SML Avvocati P.C.**
888 Prospect Street, Suite 200
San Diego, California 92037
Tel: 949.636.1391

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# WESTERN DIVISION

| | |
|---|---|
| **ENGINEER.AI CORPORATION d/b/a BUILDER.AI**, a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>**BARRY B. KAUFMAN**, an individual, and **LAW OFFICES OF BARRY B. KAUFMAN**, a California professional corporation,<br><br>Defendants. | Case No. 2:22-cv-03552-PA-KS<br><br>**PLAINTIFF'S NOTICE OF MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM IN SUPPORT**<br><br>Date:  July 11, 2022<br>Time:  1:30 p.m.<br>Ctrm:  9A<br><br>Honorable Percy Anderson |

PLEASE TAKE NOTICE that on July 11, 2022 at 1:30 p.m. before the Honorable Percy Anderson, Plaintiff Engineer.ai Corporation d/b/a Builder.ai ("Builder") will move for a preliminary injunction under Fed. R. Civ. P. 65(a). This Motion is based upon this Notice and Memorandum herein, and the pleadings and other papers on file, including the declaration and exhibits filed herewith, and such further evidence or argument as may be presented at or before the hearing.[1]

---

[1] Pursuant to L.R. 6-1, today this Motion was served personally on Defendants.

## MEMORANDUM IN SUPPORT

A preliminary injunction is warranted where the movant "is likely to succeed on the merits, . . . is likely to suffer irreparable harm in the absence of preliminary relief, [] the balance of equities tips in [its] favor, and [] an injunction is in the public interest." *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Ninth Circuit allows a "sliding scale" whereby "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *See Hernandez v. Sessions*, 872 F.3d 976, 998 (9th Cir. 2017) (quoting *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012)). More specifically, "A preliminary injunction is appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips strongly in the plaintiff's favor." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (quoting *Lands Council v. McNair*, 537 F.3d 981, 986-87 (9th Cir. 2008)) (internal quotations omitted)); *see also Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (reiterating the "serious questions" test).

In this action, because Defendants are engaged in an unlawful, unyielding and existential course of action to injure Plaintiff Builder via disparagement and interference, the requested preliminary injunction is warranted.

## Factual Background

As set forth in detail in the Amended Complaint (*see* ECF No. 11), Defendants Barry B. Kaufman and his law firm (collectively, "Kaufman") are engaged in an ongoing campaign of business disparagement and unlawful interference which has cost Builder millions of dollars in value and equity, and more every day. *See* Pham Decl. ¶ 2. First, Defendants instigated an August 14, 2019 article in the *Wall Street Journal* entitled "AI Startup Boom Raises Questions of Exaggerated Tech Savvy" ("the WSJ Article"). *See* ECF No. 11-1. The WSJ Article is disparaging including because it opens with the misrepresentation that

Builder "says it uses artificial-intelligence technology to largely automate the development of mobile apps, but several current and former employees say the company exaggerates its AI capabilities to attract customers and investors . . . [including] Zurich-based venture-capital firm Lakestar [Advisors GmbH]." *Id.* at 2-3.  Further, it asserts that "several people familiar with the company's operations . . . suggest [it] doesn't use AI to assemble code for apps [but] relies on human engineers . . . to do most of that work, and that its AI claims are inflated even in light of the fake-it-till-you-make-it mentality among tech startups." *Id.* at 3.  Only later in the article is there a clarifying statement from Lakestar, for example, that it "has confidence in [Builder] and its team," and that Builder "has been very careful in presenting its technology to Lakestar and other investors." *Id.* at 5.  The WSJ Article fails to name its "sources," which were Defendants and their clients.  *See* Pham Decl. ¶ 3.

      In truth, the WSJ Article was and remains disparaging, and it has caused and continues to case significant irreparable harm.  The misrepresentations in the WSJ Article strike at the core of Builder's business.  For example, Builder never asserted that it solely used AI to assemble direct codes for its apps, or that it was not using engineers to assist with the development of those codes.  As is made clear in a recent Techcrunch article (*see* https://techcrunch.com/2022/03/30/builder-ai-raises-100m-series-c-led-by-insight-partners-to-scaleup-its-software-automation/), although Builder may not have been using AI to assemble the direct codes, and instead using remote-working engineers to build the apps, it was clearly using machine learning to speed up and automate large swathes of both customer interaction and engineer assignments.  *See* ECF No. 11 at 3-4 (FAC ¶ 10).  Builder has received U.S. patents and has filed several other patent applications for its AI technology, and the favorable pricing it offers customers reflects the use of its AI technology and capabilities.  *See* ECF No. 11-7.  Further, Builder's CEO Mr.

Duggal never told anyone during the relevant time that the platform was 80% built. *See* ECF No. 11 at 4 (FAC ¶ 11); Pham Decl. ¶¶ 4-7.[2]

Second, Defendants have pursued meritless lawsuits against Builder on behalf of two former employees, Holdheim and Joiner. *See* ECF No. 11 at 4-5 (FAC ¶¶ 11-19). For example, Defendants alleged in their Holdheim Lawsuit that Mr. Duggal had spent company money to fund various luxurious personal lifestyles. In fact, during the course of the litigation Mr. Holdheim admitted under oath that he: (a) had no personal knowledge of whether Mr. Duggal used company or investor funds to finance the alleged expenses; (b) was not aware that Mr. Duggal actually uses his own personal funds to finance Builder; (c) had no direct knowledge as to whether these alleged expenses were paid for by Mr. Duggal out of his personal funds; (d) never saw any evidence or Mr. Duggal blurring financial lines; and (e) had never had access to the financial records of Builder. *See id.* at 4 (FAC ¶ 13); Pham Decl. ¶ 8.

In such circumstances, where Mr. Holdheim admitted that one of his chief allegations was based on no evidence, his credibility and reliability must be drawn into question. Following this, as Defendants and Mr. Holdheim were the key source, it is clear that the WSJ Article should not have published. *See* Pham Decl. ¶ 9. The Joiner Lawsuit is meritless because Mr. Joiner was part of a reduction due to COVID, along with more than 20 others former employees in approximately the same office location. *See id.* at 5 (FAC ¶ 19); Pham Decl. ¶ 10. The WSJ Article has been cited in a number of different litigation claims brought by Defendants. In doing so, Defendants (the main source of the WSJ Article) has been able to use the false claims in the WSJ Article to procure an unfair litigation advantage, by taking advantage of the Wall Street Journal's reputation for accuracy to provide credibility

---

[2] Mr. Duggal also is initiating legal proceedings based on personality protection against Defendants in Switzerland. *See* Pham Decl. ¶ 7, Ex. A.

for the otherwise unfounded Allegation within the context of the proceedings. *See* Pham Decl. ¶ 11.

Third, in October 2021 Defendants sent a defamatory letter dated to Lakestar, which remains one of Builder's largest investors ("the Lakestar Letter"). See ECF No. 11-2. The Lakestar Letter is defamatory because it contains several false statements, including: (a) "Builder [engaged in] efforts to mislead, if not defraud, its Board of Directors, investors, customers and the general public about technological and business capabilities that Builder supposedly possessed;" (b) "Mr. Holdheim was at first marginalized and later terminated on false grounds . . . [for] complaining about fraudulent and misleading ways Mr. Duggal was promoting Builder to investors, customers and the general public;" (c) "Mr. Duggal [] abandon[ed] his new home in Beverly Hills, relocate[d] the company to London and create[d] new subsidiaries as a means to hide assets and contain liability;" (d) "[T]he consideration paid [to Mr. Holdheim] in settlement was concealed from Lakestar and other investors by being categorized as part of the 'severance payroll' to staff of the Los Angeles office which Builder has since closed as a liability containment tactic;" (e) "Mr. Duggal . . . used more than $5 million of Lakestar's funded capital to purchase a luxury home in Beverly Hills;" (f) Builder.ai was "falsely promoting that it possessed artificial intelligence ('AI') and machine learning capabilities to supposedly assemble software products 'autonomously;'" (g) "Builder has never had the technological capabilities to 'instantly' and autonomously assemble software;" and (h) "Builder still does not possess an operational or functional AI capability." ECF No. 11 at 5-6 (FAC ¶ 20); Pham Decl. ¶ 12. In addition, Defendants' purpose in the Lakestar Letter was to extort a "settlement" of $1.6 million from Builder, as mentioned specifically in the letter. *See* ECF No. 11-2 at 3 (referencing $1.6 million settlement demand); Pham Decl. ¶ 13.

Fourth, in March 2022 Defendants served an improper subpoena on Carta ("the Carta Subpoena") to obtain sensitive investor and employee information. *See* ECF No. 11-3. The Carta Subpoena is improper because it allowed an invasion of Builder's confidential information including its investor information and employees with stock options. *See* ECF No. 11 at 6 (FAC ¶ 21); Pham Decl. ¶ 14.

Fifth, in April 2022 Defendants sent a defamatory letter to Builder concerning another former employee, Mr. Angel Padilla ("the Padilla Letter"). *See* ECF No. 11-4. The Padilla Letter is defamatory because it disparages EAI's management and alleges fraud along similar lines as the Lakestar Letter. *See* Pham Decl. ¶ 15. Additionally, upon information and belief, Defendants allowed Mr. Padilla to "stalk" online certain family members of one or more of EAI's employees. Defendants further misquoted and misused Utah law to attempt to obtain confidential information of EAI and to threaten EAI and its employees with administrative and/or civil actions. But Defendants do not have a license to practice law in the State of Utah. *See* ECF No. 11 at 6 (FAC ¶ 23); Pham Decl. ¶ 16.

Sixth, Defendants unethically instructed Mr. Joiner to disclose protected attorney-client privileged discussions with Builder. *See* ECF No. 11 at 7 (FAC ¶ 24); Pham Decl. ¶ 17. Seventh, Defendants misused and misstated Utah law to threaten Builder and its employee with litigation. *See* ECF No. 11 at 6 (FAC ¶ 23); Pham Decl. ¶ 18. Eighth, Defendants threatened Builder to gain an unfair advantage during a civil dispute. *See* ECF No. 11 at 7 (FAC ¶ 25); Pham Decl. ¶ 19.

Ninth, in May 2022 Defendants sent yet another extortionist demand letter, threating to contact Builder's most recent investor Insight Partners ("the Insight Letter"). *See* ECF No. 11-5. Just like the Lakestar letter, Defendants' purpose in the Insight Letter was to extort a "settlement" of $1 million from Builder, under threat of serving a subpoena to Insight. *See* ECF No. 11-5 at 3 (stating Defendants "will not consider mediating unless [Builder's] opening offer is raised to at least $1,000,000 . . . [otherwise] I will just subpoena what I can from third party sources

like Insight Partners"). This letter was brazen harassment, even acknowledging that "I know Mr. Duggal will not like that." *Id.*; Pham Decl. ¶ 20.

Tenth, in May 2022 Defendants served another irrelevant subpoena to Insight Partners ("the Insight Subpoena"). *See* ECF No. 11-6. The Insight Subpoena is improper because (a) the scope of the subpoena is far beyond the issues in the Joiner Lawsuit, (b) Insight only recently became an investor in EAI and is outside the period of controversy between the parties, and (c) it was issued to further defame, embarrass, and tortiously interfere with EAI's business relationship with its latest investor. *See* ECF No. 11 at 6 (FAC ¶ 22); Pham Decl. ¶ 21.

Defendants' improper actions have caused severe and irreparable damage, including at least $1.2 Billion due to a $600 million Series C pre-money valuation, compared to an otherwise $1.8 billion valuation that Builder could have attained but for the interferences and harmful actions of Defendants. *See* ECF No. 11 at 7 (FAC ¶ 26). The irreparable damage to Builder will be exacerbated unless and until Defendants are enjoined from initiating any further contact with Builder's investors or potential investors, employees, and any further defamation or other disparaging statements or conduct. Further to the irreparable harm, Builder is currently in final discussions with a new round of about a dozen investors, who would inevitably be Defendants' next round of targets for harassment and false statements about Builder, its technology and business, and its CEO Mr. Duggal. *See* Pham Decl. ¶¶ 22-23.

### A PRELIMINARY INJUNCTION IS WARRANTED

Builder has asserted four claims in this action based on Defendants' actions to undermine Builder's viability, including as a result of the WSJ Article: (1) defamation, (2) business disparagement, (3) intentional interference with contractual relations, and (4) intentional interference with prospective advantage. See ECF No. 11 at 8-12 (FAC ¶¶ 28-66). Case law from this Circuit confirm the propriety of a preliminary injunction under the facts evidenced here.

For example, in *Arsenal, Inc. v. Neal*, No. 2:11-cv-01628-KJD-CWH (D. Nev. May 31, 2013), the court granted a preliminary injunction against a defendant who "published three videos . . . that undermined the quality of [Plaintiff] Arsenal's goods and services" and asserted "fraudulent behavior" just as Defendants have asserted here. Concerning the plaintiff's business disparagement claim, the court concluded that the defendant's false statement about non-compliance with a product standard was disparaging "because 'it casts doubt upon the quality' of the product and [Defendant] Neal intended this result." *See id.* at *4 (citing Restatement 2d of Torts, § 629). The court rejected any "privilege" for expressing opinions, because the statements "carry factual implications not within the protection of the First Amendment." *Id.* at *5 ("By continuing to make the video available to the public, Neal has demonstrated, at the very least, a reckless disregard for the truth.").

Concerning the claim of interference with prospective economic advantage, the court concluded:

> Arsenal sells and distributes firearms all over the world, and Neal was aware of the company's products, services, and prospective buyers. That is evidently clear because, on his channel, Neal reviews goods and services in an effort to provide useful information for consumers. . . . His refusal to remove the videos after learning of the MIL-SPEC statement's falsity demonstrates that Neal was not interested in disseminating truth but in damaging Arsenal. . . . The explicit purpose of a boycott is to deter future contractual relationships, to harm a corporation by impeding sales. Thus, viewing the refusal to remove the Combat/Test series in light of the Boycott Video makes Neal's intent to do harm adequately clear. Neal's false statements are not justified or privileged, and they caused the plaintiff actual harm by deterring prospective buyers from purchasing Arsenal's products. Lastly, by establishing the elements of business disparagement, Arsenal has

demonstrated that the means used to deter the prospective economic advantage were unlawful.

*Id.* at *7-8. A preliminary injunction was justified. "[I]t is in the public's interest that truth concerning MIL-SPEC qualifications be promulgated," and "the Court orders Neal to remove the [false video]." *Id.* at *8-9.

The Ninth Circuit itself confirmed a similar result just recently in *HiQ Labs, Inc. v. LinkedIn Corp.*, No. 17-16783 (9th Cir. Apr. 18, 2022). In that case, the district court enjoined LinkedIn from restricting access to its public user data, as an interference with prospective business advantage. Concerning irreparable harm, the court reminded that a "threat of being driven out of business is sufficient to establish irreparable harm." *Id.* at *1 (quoting *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985)). "The district court found credible HiQ's assertion that the survival of its business is threatened absent a preliminary injunction. The record provides ample support for that finding." *Id.* Concerning the balance of the equities, the court similarly concluded that the survival of HiQ's business was paramount. *Id.* (HiQ "depends on accessing, analyzing, and communicating information derived from public LinkedIn profiles").

On the merits of HiQ's claims for intentional interference and unfair competition, the court reasoned as follows: (1) "LinkedIn does not contest HiQ's evidence that contracts exist between HiQ and some customers, including eBay, Capital One, and GoDaddy;" (2) "LinkedIn knew of HiQ's contracts . . . when HiQ responded to LinkedIn's cease-and-desist letter and identified both current and prospective HiQ clients;" (3) "LinkedIn's threats to invoke the CFAA and implementation of technical measures selectively to ban HiQ bots could well constitute 'intentional acts designed to induce a breach or disruption' of HiQ's contractual relationships with third parties;" (4) "[w]ithout access to LinkedIn data, HiQ will likely be unable to deliver its services to its existing customers as promised;" and (5) "HiQ is harmed by the . . . interference [because] HiQ will likely

go out of business." *Id.* Finally, the court rejected LinkedIn's assertion of a "legitimate business purpose," finding in part that "HiQ has raised serious questions about whether LinkedIn's actions to ban HiQ's bots were taken in furtherance of LinkedIn's own plans to introduce a competing professional data analytics tool." *Id.* (concluding that the "showing on the tortious interference claim is sufficient to support an injunction prohibiting LinkedIn from selectively blocking HiQ's access to public member profiles," and "giving companies like LinkedIn free rein to decide, on any basis, who can collect and use data-data that the companies do not own, that they otherwise make publicly available to viewers, and that the companies themselves collect and use-risks the possible creation of information monopolies that would disserve the public interest").

The factual circumstances here are analogous to *Arsenal* and *HiQ*, and similarly justify the requested preliminary injunction. As in *HiQ* where the Ninth Circuit reasoned that an existential threat was more than sufficient to sustain irreparable harm and hardships justifying a preliminary injunction, here Builder already has suffered a 67% diminution in market value directly related to Defendants' improper actions, and as much as $1.2 billion lost. *See* ECF No. 11 at 7 (FAC ¶ 26). This harm would increase if Defendants are not enjoined from their disinformation, disparagemtn and harassment campaign, particularly because Builder is now in the midst of final discussions with a new round of about a dozen investors, who would inevitably be Defendants' next round of targets for harassment and false statements about Builder, its technology and business, and its CEO Mr. Duggal. *See* Pham Decl. ¶¶ 22-23.

On the merits of the intentional interference claims, as in *HiQ*, Defendants cannot plausibly contest that they were unaware of Builder's investors and potential investors, each of whom Defendants contacted directly with letters and/or subpoenas. Defendants also cannot dispute that their intentions are clear from the circumstances, that is, they engaged in "intentional acts designed to induce a breach

or disruption" of Builder's contractual relationships with third parties, as was the case in *HiQ*. On the merits of the business disparagemtn claim, here as in *Arsenal*, Defendants' communications with the press and stakeholders about Builder certainly has "cast[] doubt upon the quality" of Builder's entire business and value as a company.

Finally, concerning the public interest, the public's interest in preventing unlawful disparagement and business interference takes precedence, as in both *Arsenal* and *HiQ*.

### Conclusion

For each of the foregoing reasons, Builder respectfully requests a preliminary injunction against any further business disparagement or intentional interference by Defendants.

Respectfully submitted,

Dated: June 13, 2022      **SML Avvocati P.C.**

By: /s/ Stephen M. Lobbin
    Attorneys for Plaintiff

# CERTIFICATE OF SERVICE

I hereby certify that on June 13, 2022, pursuant to L.R. 6-1 the foregoing document was personally served on Defendants.

/s/ Stephen M. Lobbin